(197 P.3d 849)
No. 99,727

IN THE MATTER OF D.A.

Opinion filed November 26, 2008.

*Karen A. Eager*, of Disability Rights Center of Kansas, of Topeka, for appellant.

*Michael C. Hayes*, county attorney, and *Stephen N. Six*, attorney general, for appellee.

Before RULON, C.J., HILL and MCANANY, JJ.

MCANANY, J.: Two 12-year-old boys, D.A. and N.A., were ad-

judicated juvenile offenders for breaking into and vandalizing a church in Perry. D.A. appeals his adjudication, claiming the evidence against him was insufficient; his lawyer was ineffective; his due process rights were violated; the court lacked jurisdiction because he was developmentally delayed and had not yet reached the maturity of the threshold age for jurisdiction over a child under the Revised Kansas Juvenile Justice Code (Juvenile Code); and, finally, he lacked the mental maturity to form the intent necessary for adjudication for these offenses.

The charges arose from an incident on October 8, 2006. When Pastor Douglas Merriman arrived at his church that day, he discovered D.A. and N.A. sitting outside with various items of church property strewn around them. The boys fled. Upon entering the church, Merriman observed extensive damage from vandalism throughout the church. He found items torn off walls, smashed light bulbs, ceiling fans with missing blades, tipped over pianos, graffiti on the bathroom doors, water-damaged floors, a smashed chandelier, broken bathroom mirrors, paper-clogged toilets, and glitter glue on the carpets and steps. Fire extinguishers had been discharged inside the church. D.A. admitted his participation to Pastor Merriman shortly after the incident.

The boys were charged with burglary and criminal damage to property in excess of $25,000. Attorney Dennis Hawver was appointed by the court to represent the boys.

Hawver reviewed the complaint and police report and discussed possible disposition options with the prosecutor. The prosecutor expressed a willingness to dismiss the burglary charges against the boys in exchange for their stipulating to the criminal damage charges and each of their families paying half of the church's out-of-pocket expenses incurred on account of the vandalism.

Hawver first communicated with the boys in a joint meeting with them and their families on the morning of the boys' first appearances on November 21, 2006. He told them what the prosecutor was prepared to do. N.A. and his family agreed to accept the State's offer. D.A.'s family wanted more time to consider the offer, so the court continued the matter until December 12, 2006. At the end of the hearing, Hawver gave his business card to D.A.'s parents

and told them that "we could contact him to retain counsel through him or we could hire our own attorney." Hawver then told D.A.'s parents that N.A. had told the police that "it was all [D.A.]."

D.A.'s family decided to privately retain counsel to represent their son. To that end, they hired attorney Karen Eager, who entered her appearance on December 12, 2006. Hawver withdrew from representing D.A. at that time, though he continued to represent N.A. With Eager as his substitute counsel, D.A. was arraigned and pled not guilty.

On March 16, 2007, D.A. moved to dismiss the charges based upon ineffective assistance of counsel and prosecutorial misconduct. At the evidentiary hearing on May 2, 2007, the court received extensive testimony from D.A.'s mother, from the director of support services for the Association of Retarded Citizens of Douglas County, and from attorney Hawver. Following the hearing, the district court denied the motion and set the matter for trial on June 1, 2007.

At trial N.A. testified against D.A. N.A. was subpoenaed by the State to testify. There is no indication that Hawver appeared or was present for N.A.'s testimony. In fact, the appearances noted in the record indicate the contrary.

Pastor Merriman testified to the extensive damage to his church, where he had been the minister since 1999. Merriman's duties at the church included being its administrator. Over D.A.'s objection, he testified that the damage to the church exceeded $25,000.

Ramon Gonzalez, part-time police chief of the City of Perry and a part-time detective for the Jefferson County Sheriff's office, testified regarding his prior work as a risk manager for Southwestern Bell. In that job, he was trained to identify losses caused by employees and to estimate restitution costs the company would have to pay. Gonzalez testified that the water damage to the floors, the carpet damage from glue, and the discharge of fire extinguishers involved more than nine rooms in the church building. In his view, the damages were $25,000 or greater.

Before resting its case, the State amended its criminal damage charge to criminal damage to property exceeding $1,000, rather than $25,000 as originally pled.

The district magistrate judge adjudicated D.A. a juvenile offender based upon both the burglary charge and the amended criminal damage charge. Upon appeal for a de novo review on the record before the district judge, D.A. was again adjudicated based on these charges. D.A. now appeals to us.

*Sufficiency of the Evidence*

D.A. claims the court should have excluded the damages evidence as speculative and without foundation. Without it, he claims there is insufficient evidence to support the adjudication for criminal damage to property.

We review the sufficiency of the evidence, both direct and circumstantial, in the light most favorable to the State to determine if a rational factfinder could have found D.A. guilty beyond a reasonable doubt. See *State v. Garcia*, 285 Kan. 1, 22, 169 P.3d 1069 (2007); *In re B.M.B.*, 264 Kan. 417, 433, 955 P.2d 1302 (1998) . Here, the issue is whether there was substantial competent evidence to establish that the loss to the church from D.A.'s vandalism exceeded $1,000.

Except for certain unique types of personal property, the damages needed to support a conviction for criminal damage to property are measured by the cost to restore the damaged property, unless the repair costs exceed the fair market value of the property, in which case the fair market value at the time of the loss is the measure. See *State v. Jones*, 247 Kan. 537, 540, 802 P.2d 533 (1990).

While the factfinder may not rely on rank speculation, mathematical precision in the calculation of damages is not required. *Vickers v. Wichita State University*, 213 Kan. 614, 518 P.2d 512 (1974). Here, we must determine whether there was properly admitted evidence which, viewed in the light most favoring the State, establishes a loss in excess of $1,000.

Property owners are presumed to know the value of their property. *State v. Moss*, 221 Kan. 47, 49, 557 P.2d 1292 (1976). The term "owner" in the Kansas Criminal Code means any person with any interest in the subject property. K.S.A. 21-3110(13). As pastor and administrator of the church, Merriman had an interest in the

property. As the church's administrator he was charged with the care, oversight, and stewardship of the church's property, and he had the authority to speak for the church as its agent regarding the value of church property. *Cf., e.g., Brooks v. January*, 116 Mich. App. 15, 321 N.W.2d 823 (1982) (finding pastor acted as an agent for his church when he transferred church property; cited with approval in *National Inspection & Repair, Inc. v. Valley Forge Life Ins. Co.*, 274 Kan. 825, 848, 56 P.3d 807 [2002]). Further, Gonzalez testified to various items of damage he observed. While D.A. complains about the foundation for certain aspects of Gonzalez' testimony, taken as a whole, and viewed in the light most favoring the State, it is abundantly clear from the testimony of Merriman and Gonzalez that the extensive damage throughout the church caused by D.A.'s vandalism easily exceeded the $1,000 necessary to support this conviction.

*Ineffective Assistance of Counsel* .

D.A.'s claim of ineffective assistance of counsel was the focus of the trial court's extensive evidentiary hearing on D.A.'s motion to dismiss. This issue involves mixed questions of fact and law requiring de novo review on appeal. *Bledsoe v. State*, 283 Kan. 81, 91, 150 P.3d 868 (2007); *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985). To prevail on this claim, D.A. must show that Hawver's representation fell below an objective standard of reasonableness, considering all the circumstances. Then he must show that but for Hawver's deficient performance, there is a reasonable probability the outcome of the proceedings would have been more favorable to D.A. See *Bledsoe*, 283 Kan. at 90-91.

### A. Conflict of Interests

The right to the effective assistance of counsel arises from the provision in the Sixth Amendment to the United States Constitution which requires that "[i]n all criminal prosecutions, the accused . . . shall have . . . the Assistance of Counsel for his defense." The right to counsel is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771, 25 L. Ed. 2d 763, 90 S. Ct. 1441 (1970). As stated in *Strickland v. Washing-*

*ton*, 466 U.S. 668, 686, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984): "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Stated more directly, "the purpose . . . of the Sixth Amendment . . . is simply to ensure that criminal defendants receive a fair trial." 466 U.S. at 689.

Though D.A. cites Hawver for violating nine specific Kansas Rules of Professional Conduct in his brief, KRPC 1.9(a) (2007 Kan. Ct. R. Annot. 457) is the rule central to his argument. KRPC 1.9(a) provides:

"A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."

The fact that counsel represents more than one defendant does not automatically make counsel ineffective. *State v. Lem'Mons*, 238 Kan. 1, 5, 705 P.2d 552 (1985). An actual conflict of interests is required. 238 Kan. at 5. Here, D.A. must demonstrate that an actual conflict adversely affected his lawyer's performance. See *Jenkins*, 257 Kan. 1074, Syl. ¶ 5, 898 P.2d 1121 (1995).

In *Holloway v. Arkansas*, 435 U.S. 475, 490-91, 55 L. Ed. 2d 426, 98 S. Ct. 1173 (1978), codefendants moved for, but were denied, separate counsel in a capital case in which they alleged their lawyer had a conflict of interests in representing both of them. The Supreme Court did not reach the issue whether an actual conflict of interests existed. Nevertheless, it determined that the trial court unconstitutionally endangered the right to counsel and turned to the issue of prejudice. The Court concluded:

"In the normal case where a harmless-error rule is applied, the error occurs at trial and its scope is readily identifiable. . . . But in a case of joint representation of conflicting interests . . . [i]t may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but . . . to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation." 435 U.S. at 490-91.

Three justices dissented, expressing the concern that the majority opinion "contains seeds of a *per se* rule of separate representation." 435 U.S. at 491.

The issue arose again 2 years later in *Cuyler v. Sullivan*, 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980). After confirming that "unconstitutional multiple representation is never harmless error," the Court noted that a showing that counsel "actively represented conflicting interests" is a constitutional predicate to a claim of ineffective assistance of counsel. 446 U.S. at 350. The Court concluded:

"We hold that the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. at 350.

Four years later in *Strickland*, the Court explained that what amounts to an irrebuttable presumption of prejudice exists only in a narrow field of conduct, such as when the defendant is completely denied the assistance of counsel or when the State interferes with counsel's assistance. On the other hand, the Court observed that the type of claim presented in *Cuyler* warrants a more limited presumption which does not equal a per se rule of prejudice, but rather requires a showing of an actual conflict that affects the lawyer's performance. 466 U.S. at 692.

This court considered the issue in *State v. Ryan*, 29 Kan. App. 2d 297, 299, 26 P.3d 707, *rev. denied* 272 Kan. 1422 (2001). In *Ryan*, the defendant and her brother were both represented by the same counsel for their drug charges. Counsel negotiated a favorable plea which Ryan accepted. As required by the plea agreement, Ryan testified against her brother at her plea hearing. The charges against Ryan's brother were dismissed, and Ryan sought to withdraw her guilty plea, which the court denied. The trial court found that a conflict existed, but the conflict could only have prejudiced Ryan's brother, not Ryan. This court reversed, 29 Kan. App. 2d at 300, finding that prejudice is presumed under these facts and citing *State v. Jenkins*, 257 Kan. at 1084, wherein the court declared: "Prejudice to the defendant is presumed, and reversal of the defendant's conviction is automatic."

In *Jenkins*, defendant's counsel represented the police's confidential informant who engaged in a controlled drug buy which led to the current charges against the defendant. Counsel brought this to the attention of the trial court and her client. At the hearing where this was disclosed, counsel asked her client, "[A]re you willing to go forward with me as your attorney in this case?" Jenkins answered, "Yes." 257 Kan. at 1077. Counsel continued in her representation of both the defendant and the informant. The informant testified against the defendant at trial.

Unlike the attorneys in these cited cases, here, attorney Hawver had no contact whatsoever with these two boys until the date of their arraignment. Hawver's contact with D.A. and his family was limited to that day. With respect to D.A.'s case, nothing happened that day. His arraignment was continued to a new date when his family chose not to accept the plea agreement proposed by the prosecutor. In the meantime, D.A.'s family retained separate counsel and Hawver withdrew. D.A.'s new counsel represented D.A. at the arraignment and throughout the case thereafter, including this appeal. D.A. had the duty to show that an improper dual representation of the boys accused in this incident affected Hawver's representation of D.A. He has failed to do so.

D.A. contends that Hawver did not protect confidential attorney-client communications. He identifies no such confidential communications. Our examination of the record discloses only the communications at D.A.'s first appearance, which was continued at D.A.'s request. Any communications between Hawver and the boys and their families occurred before the scheduled hearing that day and in a joint meeting, not separately with each boy and his parents. None of those communications were of a confidential nature. See *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 375-76, 22 P.3d 124 (2001) (gathering authorities). Further, D.A. concedes there were no communications with Hawver before his first appearance. In fact, he argues that Hawver was ineffective for failing to return phone calls before that first hearing. In making this claim, D.A. claims no nexus between Hawver's dual representation of the boys and his failure to return phone calls. Given Eager's entry as new counsel before the initial proceedings in the case and the

subsequent entry of D.A.'s not guilty plea, the lack of communication was of no consequence. D.A. does not demonstrate that he was in any way prejudiced by Hawver's lack of communication.

D.A. also contends Hawver failed to adequately explain to him and his family the advantages and disadvantages of the State's plea agreement offer, its ramifications, D.A.'s defenses, and the ramifications of N.A. accepting the plea agreement and D.A. rejecting it. It is important to note that at no time while Hawver was representing D.A. did D.A. reject the State's offer. D.A.'s first appearance was continued to allow his family to consider further the State's offer. Hawver had no further communication with D.A.'s family. Attorney Eager then entered her appearance before D.A.'s arraignment. There is nothing to indicate that the State's offer was not still outstanding. It was only after Eager entered her appearance that D.A. and his family chose to reject the State's offer. At that time, both D.A.'s family and Eager were aware of the fact that N.A. had accepted the plea agreement and contended that D.A. had committed the vandalism. We presume that Eager fulfilled her responsibility to advise D.A. and his family regarding the plea offer and the various possible consequences before entering a plea. D.A. fails to explain how Hawver's performance had any bearing on the plea he entered and the proceedings that followed.

D.A. also argues that Hawver was hostile and disloyal to him by openly declaring D.A.'s guilt. D.A. refers us to the record of the hearing on his motion to dismiss where Hawver, who had been replaced by Eager as D.A.'s counsel, was called to testify. It is important to note that Hawver's testimony was based upon (1) his review of the charges in the juvenile complaint, (2) his review of the police report, (3) D.A.'s admission to Pastor Merriman of his participation in the vandalism, (4) N.A.'s statement to the police, and (5) Hawver's discussions with the prosecutor regarding the State's position on settlement. None of Hawver's testimony was based upon any confidential communications between him and D.A. or D.A.'s family.

The cross-examination of Hawver brings to mind the old aphorism, "Be careful what you ask for, you might get it." Attorney Eager asked Hawver, "[Y]ou made a decision in this case that he

was, he was guilty, didn't you?" There being no objection, Hawver was required to answer, which he did: "Based on the police report and the statement of the child and the co-defendant, I made the determination that he was there and that he participated in vandalism." Hawver's task in undertaking D.A.'s representation included a factual investigation to determine D.A.'s potential exposure to the State's charges. He did that in advance of his first and only meeting with D.A. His truthful response to the question he was asked by D.A.'s own attorney displayed neither hostility nor disloyalty to D.A.

D.A.'s sole authority for the impropriety of Hawver's conduct in this respect is *Fisher v. Gibson*, 282 F.3d 1283 (10th Cir. 2002). *Fisher* does not apply. In *Fisher*, the defendant was sentenced to death following a trial at which the defense counsel failed to cross-examine most of the State's witnesses and called the defendant as the only defense witness. In the penalty phase, defense counsel waived opening statement, presented no evidence, and waived closing argument. Unlike in *Fisher*, Hawver did not represent D.A. when D.A. entered his plea or any time thereafter. The conduct of D.A.'s case, from the day he entered his plea through trial and the final disposition hearing, was in the hands of Eager, not Hawver. D.A. fails to demonstrate that Hawver's affirmative answer to Eager's leading question demonstrates disloyalty that led to a less favorable outcome for D.A. than would otherwise have occurred.

D.A. also directs us to a portion of the record of that hearing where Hawver was asked whether he made the statement " 'your kid's guilty' " to D.A.'s parents, apparently immediately before the December 12, 2006, hearing where D.A. entered his plea. Hawver did not recall making the statement. On the one hand, D.A. criticizes Hawver for not adequately advising him and his family about the case and, on the other hand, for candidly expressing his factual opinion after review of the available evidence to the very persons responsible for making decisions about how D.A. should proceed. Hawver's remark, if made, does not evidence hostility to his client.

Returning to first principles, we must not forget that the Sixth Amendment's requirement that the accused have the effective assistance of legal counsel is to assure the defendant a fair trial. Coun-

sel is ineffective when his or her conduct "undermine[s] the proper functioning of the adversarial process" so that we cannot rely on the trial "as having produced a just result." *Strickland*, 466 U.S. at 686. D.A. presents neither argument nor evidence that leads us to question the integrity of the process from arraignment to adjudication and disposition based upon anything Hawver did or failed to do.

### Violation of Due Process by the Prosecutor

D.A. next argues that the prosecutor in this case "in effect took advantage of a minor disabled child defendant who had no attorney protecting his legal rights." He argues that the prosecutor knew or should have known of Hawver's conflict, and the prosecutor "secured the plea and testimony of [N.A.] at the expense of the constitutional rights of D.A." These actions caused "irreparable harm and prejudiced D.A. and fundamentally impacted his right to due process of law."

This claim fails for several reasons. First, it presumes that Eager's role was that of the proverbial potted plant. D.A. was not left alone and abandoned and subject to being preyed upon by the prosecutor. Eager was D.A.'s trial counsel at the time D.A. chose to reject the State's plea offer and to proceed to trial. She actively and vigorously defended her client from the day D.A. entered his plea.

With respect to D.A.'s claim that the prosecutor is responsible for ensuring conflict-free defense counsel, we, like D.A., are unable to find any authority for this proposition. Hawver withdrew from the case. Eager entered her appearance and, presumably, reviewed with D.A. and his family the advantages and disadvantages of the outstanding plea offer, after which D.A. and his family rejected the offer and chose to go to trial. D.A. fails to explain how the prosecutor took advantage of the situation given these facts.

D.A. relies on *State v. Price*, 24 Kan. App. 2d 580, 581-82, 948 P.2d 1145 (1997). *Price* dealt with the issue of inappropriate prosecutorial statements. *Price* does not hold that prosecutors violate due process by failing to remain vigilant against defense counsel's conflicts.

D.A. also relies on *State v. Campbell*, 29 Kan. App. 2d 50, 62, 23 P.3d 176 (2001), which dealt with a prosecutor who lied about the existence of exculpatory evidence. Generally, *Campbell* teaches that prosecutors cannot lie to win. 29 Kan. App. 2d at 60-61. *Campbell* does not stand for the proposition that prosecutors violate due process when they do not ensure that defendants have conflict-free counsel.

The prosecutor did not violate D.A.'s due process rights.

*Subject-Matter Jurisdiction*

D.A. argues that even though he was 12 years of age when charged, he was not subject to the Juvenile Justice Code because his developmental disabilities caused him to have the cognitive and emotional maturity of a child under the age of 10. He argues that since the State can seek to rebut the presumption of juvenile status and try a juvenile as an adult under the Kansas Criminal Code, K.S.A. 2007 Supp. 38-2347(a)(1), he also should be able to rebut the presumption that he is subject to the Juvenile Justice Code with evidence that he should be treated as a child in need of care (CINC).

This is not the law in Kansas. D.A. argues, however, that we should follow the lead of Pennsylvania, New York, California, Washington, and Maryland, states that have created an "infancy defense" to the jurisdiction of their juvenile codes.

The "infancy defense" in juvenile proceedings is not as well established as D.A. claims. The Pennsylvania case he cites, *Comm. v. Durham*, 255 Pa. Super. 539, 389 A.2d 108 (1978), has been overruled on this precise point of law by *In re G.T.*, 409 Pa. Super. 15, 25, 597 A.2d 638 (1991). The New York case, *In re Andrew M.*, 91 Misc. 2d 813, 398 N.Y.S.2d 824 (1977), is factually irrelevant because it dealt with an 8-year-old child who would be exempt from the juvenile code anyway. The California case, *In re Marven C.*, 33 Cal. App. 4th 482, 487, 39 Cal. Rptr. 2d 354 (1995), actually *rejects* the argument D.A. advances. So does the Washington case he cites. *State v. T.E.H.*, 91 Wash. App. 908, 912-13, 960 P.2d 441 (1998). Maryland, as reported in *In re William A.*, 313 Md. 690,

698-99, 548 A.2d 130 (1998), is the only state recognizing this defense to juvenile code jurisdiction.

D.A.'s argument presents an issue of statutory interpretation over which we exercise unlimited review. See *State v. Storey*, 286 Kan. 7, 9-10, 179 P.3d 1137 (2008). Our first task is to ascertain the legislature's intent, if possible, by applying the plain meaning of the statutory language. *State v. Stallings*, 284 Kan. 741, 742, 163 P.3d 1232 (2007). We do not strain to find ambiguities when none is apparent. See *American Family Mut. Ins. Co. v. Wilkins*, 285 Kan. 1054, 1059, 179 P.3d 1104 (2008). If the statute is plain and unambiguous, we need only apply the statute as written and need not resort to the rules of construction. See *In re K.M.H.*, 285 Kan. 53, 79, 169 P.3d 1025 (2007).

The Juvenile Code defines "juvenile" as:

"a person to whom one or more of the following applies, the person: (1) Is 10 or more years of age but less than 18 years of age; (2) is alleged to be a juvenile offender; or (3) has been adjudicated as a juvenile offender and continues to be subject to the jurisdiction of the court." K.S.A. 2007 Supp. 38-2302(i).

K.S.A. 2007 Supp. 38-2304 provides, in relevant part,

"(a) Except as provided in K.S.A. 2007 Supp. 38-2347 [the trial-as-an-adult exception section], proceedings concerning a juvenile shall be governed by the provisions of this code.

. . . .

"(c) When a complaint is filed under this code, the juvenile shall be presumed to be subject to this code, unless the contrary is proved."

These statutes clearly provide that only those persons chronologically younger than 10 or older than 18 are not subject to the Juvenile Code. K.S.A. 2007 Supp. 38-2302(i)(1). No exception is listed in the Juvenile Code for persons chronologically within the Code's age range but "developmentally" younger than age 10. Except as provided in K.S.A. 2007 Supp. 38-2347, the Juvenile Code considers only how long a child has been alive.

Further, the Juvenile Code presumptively applies to children between the ages of 10 and 18, unless the *State* proves the contrary. K.S.A. 2007 Supp. 38-2304(a). According to the statute, the State is the only party that may move that the proceedings not be held pursuant to the Juvenile Code. K.S.A. 2007 Supp. 38-2347, the

trial-as-an-adult exception, is the only jurisdictional exception in the Juvenile Code and the only jurisdictional exception listed in 38-2304(a).

A juvenile may come within the Juvenile Code by overcoming the presumption of adulthood described in K.S.A. 2007 Supp. 38-2347(a)(2). There is no corollary for younger children seeking to be treated as CINC rather than juvenile offenders. Given the plain and unambiguous expression of the legislature, D.A.'s argument fails.

### Mens Rea

Finally, D.A. argues that his diminished capacity negates the intent elements of the crimes charged. D.A. was adjudicated a juvenile offender based upon criminal damage to property and burglary. Criminal damage to property is a general intent crime. *State v. Sterling*, 235 Kan. 526, 530, 680 P.2d 301 (1984). Therefore, the only intent the State needed to prove to convict D.A. was that D.A. purposefully or knowingly caused damage to the church. See K.S.A. 21-3720(a)(1). That is, so long as D.A.'s actions inside the church were not accidental or involuntary, he possessed the required culpable intent. See K.S.A. 21-3201(b).

Here, it is clear from the evidence that D.A.'s actions were not accidents and that D.A. knew what he was doing. He intentionally entered the church. He intentionally broke windows, lights, and mirrors, he caused sinks and toilets to overflow, and he overturned expensive electronic organs. He wrote profanity on the women's bathroom door without assistance from N.A.

Dr. Nichols, D.A.'s expert witness, testified that D.A.'s pervasive developmental disorders were not so debilitating as to prevent him from controlling his actions. The test in Kansas for diminished capacity focuses on whether a defendant had the required criminal state of mind, not on his or her ability to make moral choices. K.S.A. 22-3220; *State v. Pennington*, 281 Kan. 426, 434, 133 P.3d 902 (2006). Here, D.A. intended the consequences of his actions, so his diminished capacity argument fails with respect to the criminal damage to property charge.

Burglary is a specific intent crime. K.S.A. 21-3715; *State v. Harper*, 235 Kan. 825, 827, 685 P.2d 850 (1984). To convict D.A. of burglary, the State needed to prove that he entered or remained in the church with the intent to commit criminal damage to property, a general intent crime. See *State v. Gutierrez*, 285 Kan. 332, 338-39, 172 P.3d 18 (2007). Intent may be inferred from circumstantial evidence. *State v. Dunn*, 243 Kan. 414, 431, 758 P.2d 718 (1988). Here, there was direct evidence that D.A. and N.A. remained in the church in order to "destroy stuff." The damage was extensive, and it extended through more than nine rooms in the church. From the extent of the damage and the amount of time it would have taken to accomplish it, it is apparent that once the destruction began, D.A. made a decision to stay inside the church to complete the rampage. See *Dunn*, 243 Kan. at 431; *Sterling*, 235 Kan. at 530. There is ample evidence from which the trial court could conclude that D.A. had the requisite intent to commit the crime of burglary. Therefore, his argument fails with respect to the burglary charge.

Affirmed.