NOT DESIGNATED FOR PUBLICATION

No. 122,383

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOHNNY LEE JACKSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Chase District Court; JEFFRY J. LARSON, judge. Opinion filed January 15, 2021.
Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Michael J. Duenes*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., POWELL and GARDNER, JJ.

PER CURIAM: Johnny Lee Jackson was recorded by a car wash outdoor camera driving his SUV to the car wash and prying open the car wash utility door. Police investigated the break in and, after reviewing the video, called Jackson to ask him about what he knew about the break in. In a phone call with police, Jackson said that his license plate had been stolen earlier in the week and he did not know anything about the break in. A couple of days later, Jackson recanted and confessed to the burglary.

A jury found Jackson guilty of burglary of a nondwelling, felony criminal damage to property, and interference with law enforcement. On appeal, Jackson argues that there

1

was insufficient evidence to prove that he was guilty of felony criminal damage to property and interference with law enforcement. Because we find the evidence was sufficient for both charges, we affirm.

FACTUAL AND PROCEDURAL HISTORY

In the early morning hours on October 27, 2018, Chase County Sheriff Richard Dorneker learned that an alarm had sounded at the Chase County Car wash in Cottonwood Falls. Five minutes later, Dorneker responded to the alarm. A short time later Chuck Maggard, the car wash owner, arrived. He and Dorneker checked inside the car wash but did not find anyone. They did note that some louvers on the lower part of the steel utility door had been removed and that the door appeared to have been pried open.

After checking the security cameras at the car wash, Dorneker learned that a black SUV had recently parked at the car wash. Its license plate was visible. The vehicle was registered to Johnny Lee Jackson, who resided in Wellington, Kansas. Video showed someone, later identified as Jackson, leaving the vehicle and approaching the car wash. The video also showed that a woman was in the SUV with Jackson.

Dorneker got Jackson's phone number from dispatch and called him. Dorneker asked Jackson if he was still in Cottonwood Falls and Jackson hung up the phone. Dorneker called back and Jackson said that he was in bed and hung up again.

Dorneker contacted the Wellington police department and asked an officer to go to Jackson's house to see if he was there. At around 4 a.m., the Wellington police officer arrived at Jackson's residence but did not see a dark SUV. A little over an hour later, the officer drove by again and saw a black SUV, without a license plate, parked at the residence. According to Dorneker, the license plate had been reported stolen in Wichita

2

during the week of October 24, 2018, and was entered in the national database as stolen at 6:34 the morning of the incident.

At around 8 a.m. the same day, Dorneker spoke with Jackson on the phone and told him what information he had gathered regarding the burglary and asked Jackson to come in for an interview. During that phone call, Jackson told Dorneker that "'he didn't know anything about'" the break in and that "'his tag was stolen in Wichita some time last week so it wasn't him.'"

A couple of days later, Jackson and his wife went to speak with Dorneker. Jackson was read his *Miranda* rights. Dorneker explained what the recording showed and asked Jackson where he was early in the morning of October 27. Jackson replied, "[Y]ou have it all right there." While discussing the reportedly stolen tag, Jackson explained that he found it. According to Jackson, his friend found it in the street and returned it. Jackson also explained that the woman in the SUV at the time of the burglary was not his wife. Jackson said that he and his wife had gotten into an argument earlier that day and he had connected with the other woman hoping to have sex with her. He admitted to taking the louvers out of the utility door and using a pry bar to force the door open.

Jackson was charged with burglary of a nondwelling, felony criminal damage to property with a value between $1,000 and $25,000, and felony interference with law enforcement for making a false report.

At trial, Maggard testified that he did not give Jackson permission to break into the car wash. He also testified that purchasing a new door and frame would cost around $610.51 and removing the old door and installing the new door would cost another $500. The damaged door was more than three years old and he did not know the cost of the door when it was new.

3

The jury found Jackson guilty as charged. Jackson timely appeals.

ANALYSIS

On appeal, Jackson raises two sufficiency of the evidence arguments. First, he argues that there was insufficient evidence to support his conviction for criminal damage to property with a value between $1,000 and $25,000. Second, he argues there was insufficient evidence to support his conviction for interference with law enforcement.

> "'When sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after reviewing all the evidence in a light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations.' [Citation omitted.]" *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

*There was sufficient evidence to support Jackson's conviction for criminal damage to property.*

On appeal, Jackson argues that there was insufficient evidence to prove that the value of the damaged door was more than $1,000. His argument relies on the assertion that the cost of the new door and frame was slightly more than $600, and that the State could not rely on the installation cost to increase that amount to over $1,000. He also argues that the State could not establish that the value of the door was more than $1,000 because the cost of the door and frame itself was limited to the $610.51 amount. His arguments are unpersuasive.

To establish that Jackson was guilty of criminal damage to property, the State was required to prove, beyond a reasonable doubt, that he "by means other than by fire or explosive: (1) Knowingly damage[ed], destroy[ed], defac[ed] or substantially impair[ed]

4

the use of any property in which another has an interest without the consent of such other person." K.S.A. 2018 Supp. 21-5813(a)(1). The severity of the crime is determined by the valuation of the damage done to the property. If the value is at least $1,000 but less than $25,000, criminal damage to property is a level 9 nonperson felony. K.S.A. 2018 Supp. 21-5813(c)(2). To determine the value of the damage to property:

> "[D]amages may include the cost of repair or replacement of the property that was damaged, . . . reasonable labor costs of any kind, reasonable material costs of any kind and any reasonable costs that are attributed to equipment that is used to abate or repair the damage to the property." K.S.A. 2018 Supp. 21-5813(f).

Jackson's argument that the labor costs to remove the old door and replace it with a new door cannot be used to determine the value of the damaged property is contrary to the plain language of the statute. By law, the damage calculation can include the reasonable labor costs to repair or replace the damaged property. That would include the $500 to remove the old door and replace it with a new door. See K.S.A. 2018 Supp. 21-5813(f); see also *State v. Sasser*, 305 Kan. 1231, 1243, 391 P.3d 698 (2017) (noting that valuation of damage to a vehicle includes the cost of replacement parts and installation).

Jackson also cites *In re D.A.*, 40 Kan. App. 2d 878, Syl. ¶ 1, 197 P.3d 849 (2008), for the proposition:

> "Except for certain unique types of personal property, the damages needed to support a conviction for criminal damage to property are measured by the cost to restore the damaged property unless the repair costs exceed the fair market value of the property, in which case the fair market value at the time of the loss is the measure."

Jackson argues that the door and frame were not a unique type of personal property, thus, the cost to restore the damaged property cannot exceed the fair market value of the door at the time of the loss. However, the value of the property damaged is

5

not limited to the value of the door and frame. Instead, it should be gauged based on the value of the car wash itself. While the value of the car wash is not included in the record, it is certainly higher than the $1,110.51 cost of replacing the damaged door.

When viewed in a light most favorable to the State, there was sufficient evidence to prove that Jackson damaged the car wash utility door and that the cost to repair or replace the damaged door, including the cost of labor to do so, was more than $1,000 but less than $25,000.

*There was sufficient evidence to support Jackson's conviction for interference with a law enforcement officer.*

Jackson also argues that there was insufficient evidence to support his conviction for interference with law enforcement. The instructions given to the jury required the State to prove that Jackson knowingly reported false information to Dorneker with the intent to influence, impede, or obstruct Dorneker's duty on or about the 27th day of October 2018. In addition, the instructions noted that there were "distinct multiple acts, which could separately constitute the crime of interference with a law enforcement officer. In order for the defendant to be found guilty of interference with a law enforcement officer you must unanimously agree upon the same underlying act."

During closing arguments, the prosecutor argued that Jackson committed interference with law enforcement by falsely reporting that his license plate had been stolen and that the woman with him at the car wash was not his wife. The later claim was based on Dorneker's testimony at trial that Jackson's wife looked just like the woman in the video surveillance footage. Jackson does not argue any unanimity problems, presumably because the claim that the person with him was not his wife was not made on October 27. Jackson argues the State failed to prove there was any interference on October 27 because the only report Jackson purportedly made to Dorneker on the 27th

6

was that he was "in bed." In a later conversation, Jackson indicated that he would pay for damage to the door and was willing to speak to Dorneker.

As Jackson sees it, the only possible false report Jackson made to Dorneker occurred on October 29, when Jackson informed Dorneker that his license plate had been stolen. It should be noted that Jackson maintains that he was telling the truth at the time, that he believed his license had been stolen but was later returned. But the record indicates otherwise.

Dorneker testified that in the 8 a.m. phone call on October 27, Jackson told him that "he didn't know anything about" the break in and that "his tag was stolen in Wichita some time last week *so it wasn't him*." (Emphasis added.) He also told Dorneker, "in those early morning [conversations]" that he did not drive a black Yukon, but a white Dodge. Although later in the morning Jackson texted Dorneker to see if he could just pay for the damages, Jackson's eventual confession to Dorneker did not happen for two more days.

There is substantial evidence in the record to support the jury's finding that Jackson's statements on or about October 27 included false information. The security video shows that the SUV had a license plate on it at the time of the burglary. And Jackson later admitted to committing the burglary. It is not difficult to see how a jury could find that Jackson's statement to Dorneker was false information made with the intent to influence, impede, or obstruct Dorneker's investigation. This court is not in a position to reweigh the evidence or pass on the credibility of the witnesses. The jury determined that Jackson interfered with law enforcement through his statements. And the record, when viewed in a light most favorable to the State, contains evidence to support that. There was sufficient evidence to support Jackson's conviction. See *Chandler*, 307 Kan. at 668.

Affirmed.